## No. 13,887.

VALDEZ, GUARDIAN *v.* SHAW ET AL.

(66 P. [2d] 325)

Decided March 1, 1937.

Mr. H. M. HOWARD, Mr. ANTONIO J. N. VALDEZ, for plaintiff in error.

Mr. W. SCOTT CARROLL, Mr. RALPH L. CARR, for defendants in error.

*In Department.*

Mr. Justice Young delivered the opinion of the court.

John K. Overton as guardian of Rebecca Shaw, a minor, filed a petition for the determination of heirship as a part of the proceedings in the administration of the estate of Byron Shaw, deceased. After the case was docketed in this court Overton died and Antonio Valdez was appointed guardian of the minor and substituted plaintiff in error. The petitioner alleged that Rebecca Shaw is the sole and only heir at law of said Byron Shaw. The answering claimants, surviving brothers and sister of the decedent, and descendants of a deceased brother of Byron alleged that they are his only heirs and that Rebecca Shaw is an illegitimate child and not an heir of said deceased. The decree of the county court was adverse to the petitioner and adjudged that said brothers and sister and the descendants of the deceased brother were the only heirs of Byron Shaw, and that as such they were entitled to inherit all the right, title and interest which he ''enjoyed during his lifetime in and to any and all lands, tenements, hereditaments or other property of which the said deceased died seized and possessed.'' The court also found ''that the minor Rebecca Shaw is the natural child of Byron Shaw, deceased,'' and that she ''is not an heir at law nor entitled to inherit from said Byron Shaw for the reason that said Byron Shaw never intermarried with the mother of said Rebecca Shaw subsequent to the birth of said Rebecca Shaw or at any other time or at all.'' From this decree of the county court the petitioner prosecutes the writ of error herein.

It appears from the record that the mother of Rebecca Shaw had been married to one Jiron Montoya to whom were born five children; that Montoya died and that after his death the widow married one Antonio Vigil and two children were born to them. It further appears that she first met Byron Shaw in 1927 when he hired her to work for him for about three weeks; that he again hired her

in 1928 for about three weeks and a third time in 1929. For her services she was paid weekly wages each Saturday night. She testified that when she ceased working for him on the last occasion that he told her he did not want her to work for him any more; that he wanted her to be his wife, and that she said that would be all right, that she wanted to be his wife. This conversation, as she stated, took place in Byron Shaw's house with only herself and Shaw present; she testified that she told him she had a family; that he told her he would take the truck and go for her children and effects; that he did so; that she moved into his house; that from that time on he paid her no more wages because they had agreed that she was to be his wife, and that he was to be her husband. On cross-examination she testified that at the time this agreement was entered into Antonio Vigil still was her husband, that he did not take care of her; that she and Byron got together in Byron's house and paid no attention to Vigil because he paid no attention to her and did not take care of her; that she did not consider him her husband any more and that Byron Shaw said to pay no attention to Vigil and that he was her husband.

From and after this conversation and agreement said to have occurred in 1929, the evidence discloses a situation clearly sufficient to establish a common-law marriage, but for the fact that Rosa Vigil at the time had a husband living from whom she was not divorced. A year later the minor Rebecca Shaw was born to Byron Shaw and Rosa Vigil. The child was named for Byron's mother and he at all times recognized and treated her as his daughter and recognized and treated her mother as his wife.

It appears that Antonio Vigil worked for a short time for Byron Shaw, about two years prior to the latter's death, picking up potatoes, but that Rosa did not see him while he was at the ranch. Byron Shaw died May 2, 1934.

Section 5151, C. L. 1921, concerns the descent and

104

distribution of the lands and property of one dying intestate. It provides under certain conditions, the mother being deceased, that the property of the father shall descend "to his children surviving." Nothing appears in the section requiring that the children surviving must be born in wedlock, but section 5158 provides: "Illegitimate children shall inherit the same as those born in wedlock, *if the parents subsequently intermarry,* and such children be recognized after such intermarriage by the father to be his, and illegitimate children shall inherit from their mother the same as those born in wedlock." Reading these two sections together we think it clearly appears that the surviving children to which reference is made in section 5151 means those born in wedlock. To hold otherwise would leave section 5158, supra, without meaning, for the term "children surviving" used in the first section is broad enough, unless limited by section 5158, to include illegitimate children who are given the right under section 5158 to inherit only under certain specified conditions.

Under such a construction of these two statutes the minor child, Rebecca Shaw, cannot inherit from Byron Shaw, her father, unless she is in law his legitimate child. Even if the attempted marriage by agreement, followed by conduct sufficient in law to constitute a valid common-law marriage between parties competent to contract marriage, be given the same force and effect as a ceremonial marriage between Byron Shaw and Rosa Vigil, under the existing conditions such marriage was void in law, because Rosa Vigil had a husband living from whom she was undivorced at the time the attempted marriage was contracted.

"At common law * * * the issue of an illegal or void marriage was illegitimate." 3 R. C. L., p. 723, §3.

Plaintiff in error contends that under chapter 127, Session Laws of 1933, entitled "An Act Concerning Annulments of Marriage," a child born of a void marriage is legitimate. That act so far as here material is

as follows: "Section 1. All marriages wherein either party is under the age of eighteen years, are hereby declared to be voidable.

"Section 2. Actions for annulment may be maintained upon the following grounds:

"(a) Upon the ground set forth in section 1 hereof, providing the party seeking such annulment is under the age of nineteen years at the time of the institution of the suit.

"(b) In such other cases as are recognized in equity."

"Section 6. No decree annulling a marriage shall affect the legitimacy of any child born as the issue of such void or voidable marriage, and any such child shall be deemed to be the legitimate child of each of said parents." Answering this contention defendants in error say that section 6 refers only to cases where an annulment proceeding is brought and that no such proceeding is here involved. With this contention we agree.

Judgment affirmed.

MR. CHIEF JUSTICE BURKE and MR. JUSTICE BOUCK concur.